Harold F. SCATTERGOOD, Jr., and Dorvin Rosenberg, individually and on behalf of a class of the public shareholders of Andrews Group, Inc. and as a minority shareholder of Andrews Group, Inc. acting on its behalf, Appellants in No. 90–1411,

v.

Ronald O. PERELMAN, Andrews Group, Inc.; MacAndrews & Forbes Holdings, Inc.; William C. Bevins, Jr., Donald G. Drapkin; Donald A. Engel; Howard Gittis; Steven J. Green; E. Gregory Hookstratten; Linda Godsen Robinson; Bruce Slovin; Michael L. Tarnopol; Walter R. Yetnikoff; and Michael C. Curb

Harold F. Scattergood, Jr., and Dorvin Rosenberg, Appellants in No. 90–1680.

Nos. 90–1411, 90–1680.

United States Court of Appeals, Third Circuit.

Argued Nov. 13, 1990.

Decided Sept. 23, 1991.

Rehearing Denied Oct. 24, 1991.

Tom P. Monteverde (argued), Jean C. Hemphill, Michael E. Scullin, Monteverde, Hemphill, Maschmeyer & Obert, Philadelphia, Pa., for appellants.

Stephen P. Lamb (argued), Paul L. Regan, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., Alan J. Davis, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, Pa., for appellees.

MacAndrews & Forbes Holdings, Inc., Ronald O. Perelman, Howard Gittis, Donald G. Drapkin, Bruce Slovin, and William C. Bevins, Jr., Stephen E. Jenkins, Ashby, McKelvie & Geddes, Wilmington, Del., for appellee Andrews Group, Inc.

Before STAPLETON, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This case arises out of a merger between AGI Acquisition Corporation ("AGI") and Andrews Group, Inc. ("Andrews"). Before the merger, MacAndrews and Forbes Holdings, Inc., ("M & F") owned AGI and owned most of the stock of Andrews. Former Andrews shareholders complained that they purchased Andrews stock in the open market in reliance on material misrepresentations by various defendants. They also contended that the "freeze-out" merger was consummated at a price lower than the true value of Andrews' shares by means of pre-merger misrepresentations and a proxy statement containing material misstatements and omissions. The district court dismissed the plaintiffs' federal claims pursuant to Fed.R.Civ.P. 12(b)(6) and denied leave for the plaintiffs to amend their complaint to plead diversity jurisdiction and proceed with their state law claims. We will affirm in part and reverse and remand in part.

## I.

Former Andrews shareholders Harold Scattergood and Dorvin Rosenberg brought this action as individuals and as representatives of a class of former shareholders of Andrews. Their complaint named the following parties as defendants: Andrews; certain directors and officers of Andrews; M & F; certain directors and officers of M & F; and Ronald Perelman, the sole shareholder and Chairman of the Board of M & F. The merger between Andrews and AGI took place on June 4, 1990. The surviving corporation, Andrews, became a wholly owned subsidiary of M & F. Because this case was dismissed on a Rule 12(b)(6) motion, we accept as true the facts pleaded in the complaint. *Colburn v. Upper Darby Township*, 838 F.2d 663, 664–65 (3d Cir.1988).

Plaintiffs' first amended complaint, which was the focus of the proceedings in the district court, contained three counts: Count I alleged that the defendants had violated the federal securities laws "applicable to *sales* ... and the issuance of proxy materials" (emphasis supplied) and that they had violated their state-imposed fiduciary duty to plaintiffs by approving a merger agreement with a "woefully inadequate" price for the minority shares; Count II alleged derivative claims on behalf of Andrews based on alleged mismanagement of Andrews by some of the defendants; and the final count alleged that the defendants had violated Rule 14a–13 and Rule 14b–1 of the Securities Exchange Commission by failing to timely provide beneficial owners with proxies to vote on the merger. App. at 56–61, 692–697.

Despite the absence of a count asserting a federal securities claim based on fraudulently induced *purchases* of Andrews stock, the first amended complaint did contain allegations that certain defendants made misleading statements between February 1988 and June 1989 that induced members of the plaintiff class to purchase Andrews stock. These alleged misstatements occurred in a February 1988 proxy statement, a May 1989 magazine article, and a June 14, 1989, press release.

The primary focus of plaintiffs' federal claims concerns a course of conduct that commenced on June 14, 1989, and culminated in the merger of June 4, 1990. According to plaintiffs, the defendants during this period conceived a scheme to defraud by

forcing a buy-out of plaintiffs' shares for a consideration far less than the true value of those shares. The scheme involved a series of misleading press releases and public statements designed to depress the market price of Andrews' stock and a misleading proxy statement in connection with a merger in which plaintiffs received debentures for their stock.

On December 12, 1989, the directors of M & F and Andrews executed a merger agreement. The merger was subject to approval by Andrews shareholders at a meeting to be held on June 4, 1990. On May 11, 1990, Andrews issued a notice of the meeting accompanied by a proxy statement containing alleged material misstatements and omissions. At the meeting, the shareholders approved the merger. This was no surprise as approval of the merger required only a simple majority, and M & F beneficially owned approximately 57% of the outstanding shares. On the effective date of the merger, each outstanding share of Andrews common stock (other than those shares owned by persons who had opted for appraisal in accordance with Delaware law) was converted into the right to receive $7.25 principal amount of Andrews 10% Senior Subordinated Debentures due 1999.

The merger generated a series of suits in state and federal courts. The suits in state court alleged, among other things, that the merger was unfair to Andrews shareholders and that Andrews' directors had breached their fiduciary duties. On May 18, 1990, the plaintiffs filed this action in federal court and requested injunctive relief and expedited discovery. The complaint sought to enjoin the defendants from consummating the merger and from freezing out the plaintiff class by tendering them "worthless junk bonds" in exchange for their tradeable Andrews common stock.

The district court denied the plaintiffs' motion for a preliminary injunction. After the plaintiffs filed an amended complaint, the district court granted the defendants' motion to dismiss under Fed.R.Civ.P. 12(b)(6). The plaintiffs filed motions for reconsideration and for leave to file another amended complaint, which were denied.

The plaintiffs appeal from the denial of *pendente lite* relief, from the dismissal of the complaint, and from the refusal to permit a second amended complaint. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a Rule 12(b)(6) dismissal.

We confront a number of issues in this appeal. The first issue is procedural: whether the appeal from the denial of the preliminary injunction is moot. A second group of issues arises from the district court's dismissal of the plaintiffs' federal claims: whether the plaintiffs stated a claim under Securities Exchange Commission Rule 10b–5 for alleged material misstatements made by the defendants between February 1988 and June 1989; whether the plaintiffs stated a claim under Rule 10b–5 or Rule 14a–9 for misleading statements in the defendants' public statements between June 1989 and May 1990 or in the May 11, 1990, proxy statement; and whether the plaintiffs stated a claim under Rule 14b–1 or Rule 14a–13 for failing to deliver proxy materials sufficiently in advance of the June 4, 1990, meeting of shareholders. The next issue is whether the plaintiffs have standing to bring derivative claims against the defendants. The final issue is whether the district court abused its discretion in denying leave to file a second amended complaint.

## II.

■ The appeal from the denied preliminary injunction is moot. The merger has taken place, and this court has held on numerous occasions that when the event sought to be enjoined in a preliminary injunction has occurred, an appeal from the order denying the preliminary injunction is moot. *See, e.g., In re Cantwell*, 639 F.2d 1050, 1054 (3d Cir.1981).

## III.

We turn now to the plaintiffs' arguments supporting their federal claims. We start with the language of the relevant rules. Rule 10b–5, promulgated by the Securities

and Exchange Commission under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> (a) To employ any device, scheme, or artifice to defraud;
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990).

▮▮▮ Neither § 10(b) nor Rule 10b–5 explicitly provides a private right of action, but the courts have inferred one. In so doing, they have established a series of required elements. To state a claim under Rule 10b–5, the plaintiff must allege that the defendant

(1) with scienter—an intent to deceive, manipulate, or defraud, *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194–214, 96 S.Ct. 1375, 1381–91, 47 L.Ed.2d 668 (1976),

(2) made misleading statements or omissions, *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302–03, 51 L.Ed.2d 480 (1977); *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 7–8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985),

(3) of material fact, *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976),

(4) upon which the plaintiff—a purchaser or seller of the security, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–55, 95 S.Ct. 1917, 1923–35, 44 L.Ed.2d 539 (1975),

(5) relied in entering the transaction, *Basic, Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988), and

(6) which caused economic loss to the plaintiff.

*In re Phillips Petroleum Securities Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989); *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 683–86 (7th Cir.1990).

Rule 14a–9, a virtual clone of Rule 10b–5 promulgated under § 14(a) of the 1934 Act, 15 U.S.C. § 78n(a), provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9 (1990). The requirements for a Rule 14a–9 claim differ somewhat from those listed above for a Rule 10b–5 claim, but for present purposes, Rule 14a–9 can be viewed simply as a twin of Rule 10b–5 applicable to misleading statements and omissions in proxy materials.

We will discuss Rules 14a–13 and 14b–1 below.

### A.

First, we address the plaintiffs' allegations that members of the class purchased Andrews stock in reliance on a number of misrepresentations made by the defendants between February 1988 and June 1989. These allegations may be divided for purposes of analysis into misrepresentations alleged to have occurred before June 14, 1989, and misrepresentations alleged to have occurred on and after that date.

### 1.

▮▮▮ The allegations concerning the pre-June 14 misrepresentations related to Andrews' acquisition of Four Star International in June of 1986, its acquisition of Vid America in August 1986, and its acquisition of Brooks Drug in September 1986. The

*only* allegation that anything said by a defendant was false is the following:

> j) Although the precise facts concerning the losses which Andrews sustained as a result of the transactions described in the preceding paragraph were stated in various proxy statements and financial statements issued to the stockholders of Andrews, all of these documents were false and misleading in that they intentionally omitted to state the facts referred to in subparagraph i above.

App. at 13. Subparagraph i) alleges in relevant part:

> i) The Complaint in *Spen, et al. v. Andrews Group, et al.*, another class action in the Chancery Court of Delaware evolving from the present dispute, includes specific averments to the effect that the defendant Perelman accomplished each of the transactions referred to in subparagraphs (a)–(c) "through the use of inaccurate and purposely misleading and overstated financial information that formed the basis of 'fairness opinions' supposedly relied upon by certain of the Director Defendants to justify purchases to Andrews' public shareholders."

App. at 14.

This allegation of unspecified "financial information that formed the basis of [unidentified] 'fairness opinions' " falls far short of a fraud allegation adequate to meet the standard established by Fed. R.Civ.P. 9(b). Accordingly, we cannot fault the district court for failing to find a cause of action in plaintiffs' allegations concerning the period preceding June 14, 1989.

### 2.

■ Around June 14, 1989, Perelman and the other director defendants allegedly conceived a scheme to acquire all of the publicly held Andrews shares in a freeze-out merger for a value far below their true value. As a part of the implementation of that scheme, the following events allegedly took place on June 14, 1989, and the ensuing few days.

On June 14, 1989, to check the rise in the market price of Andrews shares which followed the Marvel and New World acquisitions and the Institutional Investor story, Perelman and certain of the Director Defendants, through MAF, caused MAF to issue a press release to the effect that MAF "is considering making a proposal to the Andrews Group to acquire the remaining shares not presently owned by it. * * * If it made such an offer, the price would approximate the current market price per share of Andrews Group common stock." However, the same public announcement said that MAF "has not yet determined to proceed with such transaction," and "There can be no assurance that MacAndrews & Forbes will ultimately decide to make such an offer or that the Andrews Group Board would recommend such an offer to the stockholders."

At the time this announcement was made, the bid price of Andrews stock was 7⅛ up ⅛ and the asking price was 7¼.

Notwithstanding what was said in the June 14, 1989, announcement, Perelman and other Director Defendants had no intention whatever of acquiring the public's stock in Andrews for anything even approaching its then current market price.

The calculated and actual effect of the June 14, 1989, announcement was to cap the market price of Andrews common stock at the $7.125 per share price quoted in the announcement, since MAF also announced publicly in that connection that it already owned 57% of the common stock of Andrews and so, *prima facie* at least, would have the power to obtain stockholder approval of an MAF–Andrews merger on *any* terms. Therefore, immediately following the June 14th announcement, the market price of Andrews common stock dropped sharply but then steadied at a $5 to $6 per share level which prevailed from June 15 through December 13, 1989.

On the other hand, the announcement of June 14, 1989, and the subsequent (though limited) decline in the market price of Andrews stock also created a situation in which some members of the

plaintiff class were induced to purchase shares of Andrews common on the open market in the hope and expectation that, at the very least, the stock would be acquired by MAF for $7.125 per share in the relatively near future.

App. at 21–22.

With respect to the members of the class who allegedly purchased in reliance on the June 14, 1989 press release, the defendants argue that the complaint contained no assertion that these plaintiffs experienced an economic loss as a proximate result of the alleged Rule 10b–5 violation. Defendants stress, in particular, the absence of an allegation that the value of the Andrews stock at the time of the induced purchases was less than the price paid.[1] We believe the fair inference from the complaint, if one assumes—as we must—the truth of its allegations, is that the market price paid by the plaintiffs exceeded the value of the stock at the time of purchase based on true facts. In other words, the complaint suggests that the price paid exceeded the value that the market would have established for the Andrews stock had the defendants disclosed their scheme to freeze out the public stockholders at a grossly inadequate price.[2]

Having rejected the sole challenge to the sufficiency of the allegations relating to those who purchased in reliance on the July 14 press release, we are constrained to reverse and remand for further proceedings on this limited claim. A trial may not be necessary, but the dismissal cannot stand.

### B.

■ We now turn to plaintiffs' forced sale claims based on Rule 10b–5 and Rule 14a–9. The plaintiffs make two such claims: (1) the defendants, beginning in June of 1989, conducted a fraudulent campaign of misrepresentations designed to depress the stock's price so as to facilitate a freeze-out merger at a woefully inadequate price; and (2) the defendants issued a May 11, 1990, proxy statement containing misrepresentations in connection with the vote on their freeze-out merger. Because the Supreme Court has held that, when a majority shareholder of a company pursues a freeze-out merger, the chain of causation between a pre-merger misrepresentation and the price received under the merger is broken, we will affirm the judgment of the district court with respect to these claims.

In *Virginia Bankshares, Inc. v. Sandberg,* —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), a shareholder who owned 85% of a company's stock moved to freeze out the remaining 15% in a merger. A minority shareholder complained that the proxy statement concerning the merger contained material misstatements and omissions. The Court held that where the vote of the majority shareholder was legally sufficient to effect the merger, and thus no other shareholder could affect the result of the voting, a minority shareholder cannot prove causation under § 14(a) and therefore cannot recover under that section on the basis of a misleading proxy statement. The plaintiffs in *Virginia Bankshares* insisted that the allegedly fraudulent proxy

---

**1.** We recognize that plaintiffs' counsel stated at oral argument that the plaintiffs did not purchase at a price above the true value of the shares. Given the allegations of the complaint concerning those whose purchases were induced by the June 14 press release, we do not believe counsel's statement was made with these particular plaintiffs in mind.

**2.** We express no opinion on the issue tendered by the defendants concerning the measure of damages in 10b–5 cases; that is, whether a plaintiff who purchased on the basis of misleading statements can recover only the difference between the price paid and the true value at the time of purchase. We do note that the courts of appeals have been unanimous in limiting dam-

ages to such an amount in all cases except those where the defendant was a broker-dealer or the plaintiff and defendant were in privity. *Bastian v. Petren Resources Corp.,* 892 F.2d 680, 683–85 (7th Cir.1990); *Currie v. Cayman Resources Corp.,* 835 F.2d 780, 785 (11th Cir.1988); *Huddleston v. Herman & MacLean,* 640 F.2d 534, 549–50 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974); *cf. Bruschi v. Brown,* 876 F.2d 1526, 1531–32 (11th Cir.1989) (broker case); *Marbury Management, Inc. v. Kohn,* 629 F.2d 705, 708–10 (2d Cir.1980) (same).

statement was causally connected to their loss in the forced sale. They claimed that because of public relations concerns, management would not have gone forward with the merger without soliciting the votes and securing the approval of at least some of the minority shares. Justice Souter, writing for the Court, rejected this argument with the following explanation:

> It will be recalled that in *Blue Chip Stamps* [421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)] we raised concerns about the practical consequences of allowing recovery, under § 10(b) of the Act and Rule 10b–5, on evidence of what a merely hypothetical buyer or seller might have done on a set of facts that never occurred, and foresaw that any such expanded liability would turn on "hazy" issues inviting self-serving testimony, strike suits, and protracted discovery, with little chance of reasonable resolution by pretrial process. *Id.*, at 742–743, [95 S.Ct. at 1928–29]. These were good reasons to deny recognition to such claims in the absence of any apparent contrary congressional intent.

> The same threats of speculative claims and procedural intractability are inherent in respondents' theory of causation linked through the directors' desire for a cosmetic vote. Causation would turn on inferences about what the corporate directors would have thought and done without the minority shareholder approval unneeded to authorize action.... Directors would understand the prudence of making a few statements about plans to proceed even without minority endorsement, and discovery would be a quest for recollections or oral conversations at odds with the official pronouncements, in hopes of finding support for *ex post facto* guesses about how much heat the directors would have stood in the absence of minority approval. The issues would be hazy, their litigation protracted, and their resolution unreliable. Given a choice, we would reject any theo-

ry of causation that raised such prospects, and we reject this one.

*Virginia Bankshares*, 111 S.Ct. at 2765.

▇ The Court acknowledged that the minority shareholders in *Virginia Bankshares* had "substantiated a plausible claim that [management] would not have proceeded without minority approval," noting a failed freeze-out merger attempt in the preceding year. Id. 111 S.Ct. at 2765 n. 12. The Court stressed, however, that the strength of a minority shareholder's factual showing of causation in a particular case was irrelevant because the court was rejecting nonvoting causation theories [3] as a class:

> The issue before us, however, is whether to recognize a theory of causation generally, and our decision against doing so rests on our apprehension that the ensuing litigation would be exemplified by cases far less tractable than this. Respondents' burden to justify recognition of causation beyond the scope of *Mills* must be addressed not by emphasizing the instant case but by confronting the risk inherent in the cases that could be expected to be characteristic if the causal theory were adopted.

*Id.*

While *Virginia Bankshares* addressed only alleged misrepresentations in a proxy statement and § 14(a) claims, its reasoning, as indicated by the references to *Blue Chip Stamps*, applies as well to other misrepresentations preceding a freeze-out merger, and thus its conclusion applies to § 10(b) claims in connection with freeze-out mergers. Accordingly, we conclude that *Virginia Bankshares*' bar on nonvoting causation theories applies to the claims in this case based on the misrepresentations that preceded the proxy materials as well as the misrepresentations allegedly included in those materials.

The plaintiffs in this case are in a position very similar to that of the minority shareholders in *Virginia Bankshares*. Their argument, as we understand it, is

---

**3.** A nonvoting causation theory posits a nexus between the alleged misrepresentation and loss other than through the vote by which the trans-

action is legally authorized. *See Virginia Bankshares,* 111 S.Ct. at 2762–63; *id.;* at 2771 (Kennedy, J., dissenting).

that despite the fact that M & F had the legal power to effectuate a freeze-out merger, it would not have been willing to exercise that power had it not been able to depress the price of Andrews stock by its campaign of misrepresentation and its misleading proxy statement. This argument seems to us indistinguishable from the argument rejected in *Virginia Bankshares*, where the plaintiffs argued that, but for the misrepresentations, the majority shareholder would not have been willing to effectuate the merger. Accordingly, we conclude that *Virginia Bankshares* is dispositive of plaintiffs' forced sale claims based on the alleged misrepresentations in the May 1990 proxy statement and the misrepresentations that preceded that proxy statement.[4]

## C.

The plaintiffs also alleged a cause of action under Rule 14b–1 and Rule 14a–13 based on the defendants' allegedly late distribution of proxy materials before the June 4, 1990, meeting of shareholders. 17 C.F.R. § 240.14a–13; 17 C.F.R. § 240.14b–1. Rule 14b–1 pertains only to brokers and dealers and thus does not apply to any of the defendants here. With regard to Rule 14a–13, the parties argued over whether a private right of action exists. We need not decide that issue, however, for even if one exists, the plaintiffs are again unable to meet the causation requirement imposed by *Virginia Bankshares* for claims based on § 14(a). Even if the materials were late and affected the votes of minority shareholders, no causal connection exists between those votes and the forced sale effected by the merger.

## IV.

The plaintiffs contend that the district court improperly dismissed their derivative claims. We disagree. Plaintiffs

no longer have standing to bring a derivative claim because they are no longer shareholders of Andrews. Under Delaware law, a shareholder bringing a derivative suit must be a current shareholder—a shareholder at the time of the alleged wrong and throughout the litigation. *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984). A cash-out merger terminates the standing of a plaintiff to bring or maintain a derivative suit on behalf of a corporation of which the plaintiff was, but no longer is, a shareholder. *Merritt v. Colonial Foods*, 505 A.2d 757, 763 n. 3 (Del.Ch.1986).

There is one exception to this rule, which the plaintiffs argue is applicable in this case. "If the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action," the former shareholders may prosecute such an action. *Kramer v. Western Pacific Industries*, 546 A.2d 348, 354 (Del.1988). *Kramer* implies that, for this exception to apply, the sole or at least dominant motive of the merger must be to deprive the shareholders of standing to bring the derivative suit. Here the complaint does not allege that the merger was so motivated; to the contrary, it alleges that the merger was a long planned move to freeze the minority shareholders out at an unreasonably low price.

## V.

Finally, we address the denial of the plaintiffs' motion to file a second amended complaint. We overturn a district court's denial of a motion for leave to file an amended complaint only if the denial is an abuse of discretion. *Kiser v. General Electric Corp.*, 831 F.2d 423, 426–27 (3d Cir.1987).

Under Federal Rule 15(a), leave to amend is to be "freely given when justice so re-

---

**4.** The one possible exception to this rule about freeze-out mergers relates to situations in which the majority's misstatement or omission has caused the minority shareholders to forego an opportunity under state law to enjoin a merger. *Healey v. Catalyst Recovery of Pennsylvania,* *Inc.,* 616 F.2d 641, 645–47 (3d Cir.1980); *see also* *Virginia Bankshares,* 111 S.Ct. at 2765–66. That exception, if it exists, is inapplicable here because the plaintiffs did attempt to enjoin the merger under state law.

quires." The Supreme Court has explained this standard:

> In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the other party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also Averbach v. Rival Manufacturing Co.*, 879 F.2d 1196, 1203 (3d Cir.1989) (listing factors and citing *Foman*).

In addition, section 1653 of Title 28 allows plaintiffs to amend defective allegations of jurisdiction in the trial or appellate courts. This provision "permits amendments broadly so as to avoid dismissal of diversity suits on technical grounds." *Kiser*, 831 F.2d at 427.

■ The plaintiffs' proposed second amended complaint sought to invoke the court's jurisdiction on diversity grounds, to redefine the class, to update certain events, and to add a claim for appraisal. The district court denied the motion, stating that "plaintiffs offer no reason why their June 14th [first] amended complaint did not include the appraisal claim or why the instant proposed amended complaint was not offered until two months after the June 4th shareholders meeting at which the merger was approved." *Scattergood v. Perelman*, No. 90–3451, slip op. at 3–4 (E.D.Pa. Aug. 30, 1990).

The district court was correct that most of the proposed amendments could have and should have been presented in the earlier amended complaint; as to the jurisdictional allegation of diversity, however, the district court's reasoning loses force. Diversity did not become a necessary basis for federal jurisdiction over the state law claims until the federal claims were dismissed on July 24. The plaintiffs had no reason to allege diversity until the July 24 dismissal because, before that date, the court had federal question jurisdiction over the federal claims and pendent jurisdiction over the state claims.

We conclude that the district court abused its discretion in not allowing the plaintiffs to amend their complaint to allege diversity; therefore, we will remand for the plaintiffs to amend the complaint to allege diversity. It may be, as defendants argue, that complete diversity does not exist or that the jurisdictional amount requirement cannot be met. That is for the district court to decide.

If the district court on remand finds diversity a sufficient basis for jurisdiction over the state law claims, it may of course consider the *Colorado River* doctrine to determine if it should stay or dismiss the plaintiffs' state law claims in light of the litigation in the Delaware Court of Chancery on similar claims. The factors listed in *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817–20, 96 S.Ct. 1236, 1246–48, 47 L.Ed.2d 483 (1976), are the guide for any such decision.

## VI.

We will affirm the district court's dismissal of the plaintiffs' federal claims except for the Rule 10b–5 claims of those plaintiffs who allegedly purchased Andrews shares on the basis of defendants' June 14, 1989, press release. We will also affirm the dismissal of plaintiffs' derivative claims. We will reverse and remand with directions to the district court to allow plaintiffs to amend their complaint to allege diversity and for further proceedings consistent with this opinion on the Rule 10b–5 claims based on that June 14, 1989, press release and on plaintiffs' other state law claims.