CIRO, INC. and Ciro of Bond Street, Inc. by Edward L. Schuman, Alix Cassaday, Theodore Rosen, John H. Burrows and Eunice Caplan, suing derivatively on its behalf, Plaintiffs,

v.

Abraham GOLD, Jack B. Levine and Intermediate Securities Limited, Defendants,

and

Ciro, Inc. and Ciro of Bond Street, Inc., Nominal Defendants.

Civ. A. No. 92–155–JLL.

United States District Court, D. Delaware.

March 2, 1993.

Irving Morris and Patrick Morris of Morris and Morris, Wilmington, DE, Timothy J. Dennin of Timothy J. Dennin, P.C., of counsel, for plaintiffs.

Bruce M. Stargatt and Bruce L. Silverstein of Young, Conaway, Stargatt & Taylor, Wilmington, DE, for defendants.

## OPINION

LATCHUM, Senior District Judge.

## I. *INTRODUCTION*

Defendants Abraham Gold, Jack B. Levine, and Intermediate Securities Limited ("Intermediate") along with nominal defendants Ciro, Inc. ("Ciro") and Ciro of Bond Street, Inc. ("Ciro of Bond Street") have moved to dismiss plaintiffs' second amended complaint. Docket Items ("D.I.") 48 & 49. Plaintiffs Edward L. Schuman, Alix Cassaday, John H. Burrows, and Eunice Caplan are minority shareholders of Ciro. On March 19, 1992, they commenced this shareholder derivative suit on behalf of Ciro and its wholly-owned subsidiary Ciro of Bond Street. D.I. 1. In their original complaint, plaintiffs named Gold, Levine, Intermediate, and Howard Wydham PLC ("H & W") as defendants and, in addition, named Ciro, Inc. and Ciro of Bond Street, Inc. as nominal defendants. *Id.*

Thereafter, defendants moved to dismiss the complaint. While defendants' motion was still pending before the Court, Theodore Rosen, also a minority shareholder of Ciro, moved to intervene as a plaintiff. D.I. 31. On July 13, 1992, Rosen's motion to intervene as a plaintiff was granted by an order of this Court. D.I. 33. A revised briefing schedule was then set by the Court, D.I. 34, and defendants' motion to dismiss was scheduled for oral argument.

On October 30, 1992, days before the scheduled oral argument, plaintiffs amended their complaint as of right without the approval of the Court as permitted under Federal Rule of Civil Procedure 15(a). Because of the jurisdictional ambiguities in the first amended complaint and because the first amended complaint failed to comply with Local Rule 15.1, the Court ordered the plaintiffs to serve and file a second amended complaint curing the jurisdictional ambiguities and complying with Local Rule 15.1.[1] Plaintiffs then served and filed a second amended complaint in which plaintiffs dropped H & W as a defendant. D.I. 46. Now, defendants Gold, Levine, and Intermediate have moved to dismiss the second amended complaint for: (1) failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6); (2) lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1); and (3) lack of personal jurisdiction over Intermediate pursuant to Federal Rule of Civil Procedure 12(b)(2). D.I. 48 & 49.

## II. *JURISDICTION*

Plaintiffs' second amended complaint alleges three Counts against defendants Gold, Levine, and Intermediate. Count I alleges that Gold and Levine violated §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5 promulgated thereunder by the Securities Exchange Commission ("SEC"). Count II alleges that Gold and Levine breached their fiduciary duties as directors of Ciro under Delaware law. Count III alleges that Gold and Levine violated § 14(c) and Rule 14c–6 promulgated thereunder by the SEC.

Plaintiff's second amended complaint avers that subject matter jurisdiction over the federal securities claims is founded on 15 U.S.C. § 78aa and 28 U.S.C. § 1331. The second amended complaint avers that subject matter jurisdiction over the state law claim in Count II for breach of fiduciary duties is premised upon the doctrine of supplemental jurisdiction codified at 28 U.S.C. § 1367. Section 78aa states, *inter alia,* that "[t]he district courts of the United States ... shall have exclusive jurisdiction of violations of this chapter [i.e. the Securities Exchange Act of 1934] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules or regulations thereunder." 15 U.S.C. § 78aa. Section 1331 confers upon the district courts subject matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Thus, plaintiff's second amended complaint clearly alleges a jurisdictional basis for the federal securities claims in Counts I and III.

Section 1367(a), which is part of the Judicial Improvements Act of 1990, empowers the district courts to exercise supplemental jurisdiction over state law claims that do not have an independent basis of subject matter jurisdiction when the district court possesses federal question jurisdiction and the state law claims are so related to the federal claims that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *see also Int'l Assoc. of Heat & Frost Insulators & Asbestos Workers Local Union 42 v. Absolute Environmental Services, Inc.,* 814 F.Supp. 392, at 396 & n. 3, (D.Del.1993). The allegations in Count II that Gold and Levine breached their fiduciary duties under state law are sufficiently related to the federal securities claims in Counts I and III to warrant the exercise of supplemental jurisdiction as to the state law claims pursuant to § 1367(a). However, if *none of the plaintiffs' federal securities law claims survive defendants' motion to dismiss,* the court may decline to exercise jurisdiction over the supplemental state law claims. 28 U.S.C. § 1367(c)(3); *cf. Diceon Electronics,*

---

**1.** Local Rule 15.1 provides, in pertinent part, that a motion to amend a pleading "shall include a form of the amended pleading which shall indicate in what respect it differs from the pleading which it amends, by bracketing materials to

*Inc. v. Calvary Partners, L.P.*, 772 F.Supp. 859, 860–61 (D.Del.1991).[2]

## III. FACTS

### A. STANDARD OF REVIEW FOR RULE 12(b)(6) MOTION TO DISMISS

For the limited purpose of considering defendants' defense under Federal Rule of Civil Procedure 12(b)(6) that Counts I and III of the second amended complaint fail to state claims upon which relief can be granted, the Court must accept as true all of the factual allegations in the second amended complaint. *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71, 74 (3d Cir. 1991); *see also Mortensen v. First Federal Savings & Loan Ass'n*, 549 F.2d 884, 890–91 (3d Cir.1977). "However, legal conclusions, deductions or opinions couched as factual allegations are not given a presumption of truthfulness." 2A J. Moore, J. Lucas, & G. Grotheer, Jr., *Moore's Federal Practice* ¶ 12.-07[2.–5] (1992); *see also Royal Business Group, Inc. v. Realist, Inc.*, 933 F.2d 1056, 1065–66 (1st Cir.1991); *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). The burden of demonstrating that the second amended complaint fails to a state claim rests with the defendants. *Johnsrud v. Carter*, 620 F.2d 29, 33 (3d Cir.1980). Finally, in considering defendants' Rule 12(b)(6) defense, "the Court is free to take judicial notice of certain facts [mentioned in the complaint] that are of public record ..." *Diceon Electronics*, 772 F.Supp. at 861. The SEC filings alleged in the second amended complaint to contain material misrepresentations and omissions fall within this category of public records that may be judicially noticed. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991).

### B. THE FACTUAL ALLEGATIONS OF THE SECOND AMENDED COMPLAINT

The following recitation of facts is derived from plaintiffs' second amended complaint

and will be accepted as true for the limited purpose of considering defendants' Rule 12(b)(6) defense. Nominal defendant Ciro is a Delaware corporation and together with its subsidiaries engages in the business of retailing high quality imitation jewelry. D.I. 46 at 3–4. Nominal defendant Ciro of Bond Street is a wholly-owned subsidiary of Ciro and is also a Delaware corporation. *Id.* at 4. Defendant Intermediate is a holding company organized under the laws of the Cayman Islands and is the holder of a controlling interest of Ciro's stock and the holder of all of H & W's outstanding stock. *Id.* at 8. H & W is a Scottish corporation whose principal business is to hold investments. *Id.*

Defendant Gold serves as chairman of the boards of directors for Ciro, Intermediate, and H & W. *Id.* at 4 & 8. Gold owns all of the outstanding stock of Intermediate. *Id.* at 8. As of April 1991, Gold also beneficially owned between 2,614,868 and 2,861,118 shares of outstanding Ciro common stock (including shares subject to options) which is approximately 61.8% of the outstanding common stock of Ciro. *Id.* at 4. Thus, defendant Gold possesses a controlling interest in Intermediate, H & W, and Ciro.

Defendant Levine serves as an officer of both Intermediate and Ciro of Bond Street, and also serves as a member of the board of directors of Ciro. *Id.* at 5. As of April 1991, Levine beneficially owned 750,000 shares of Ciro common stock (including shares subject to options) which is approximately 19.4% of the outstanding common stock of Ciro. *Id.* Levine allegedly obtained his Ciro common stock from defendant Gold without payment or other consideration. Together defendants Gold and Levine own in excess of 80% of the outstanding common stock of Ciro. *Id.*

The second amended complaint further alleges that defendants Gold and Levine made certain material misrepresentations and omissions in connection with two transactions, the Swarovski Note and the Electra Agreement, in violation of §§ 10(b), 14(c),

---

be deleted and underlining materials to be added." D.Del. LR 15.1

**2.** Section 1367(c)(3) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim ... if— ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

and 20(a) of the Securities Exchange Act of 1934 and Rules 10b–5 and 14c–6 promulgated thereunder. In addition, the second amended complaint also alleges that defendants Gold and Levine violated their fiduciary duties under state law with respect to the Swarovski Note, the Electra Agreement, and a third transaction, the Femar Licensing Agreement.

### 1. *The Swarovski Note*

The second amended complaint alleges that on or about March 14, 1991, defendants Gold and Levine caused Ciro to execute a promissory note to Swarovski Corporation ("Swarovski") having a principal amount of $1.5 million and an interest rate of 12½% per annum. *Id.* at 9. Swarovski, a Rhode Island corporation, manufactures and sells crystal, artificial stones, costume jewelry and optical products. *Id.* at 8. Under the terms of the promissory note, Ciro was required to pay Swarovski $1.5 million within 30 days of receiving a written demand of payment from Swarovski. *Id.* Such written demand could be made by Swarovski at any time after 90 days from the date the promissory note was executed. *Id.* at 9.

A clause in the payment provisions of the note agreement provided that Ciro could elect to pay the principal amount due by delivery of 315,790 shares of Ciro common stock in lieu of the $1.5 million. If Ciro made this election to retire the note by issuing common stock, then, under the terms of the note agreement, Swarovski would be entitled to a placement fee from Ciro in the form of either $200,000 or an additional 42,105 shares of Ciro common stock. *Id.* Thus, under the terms of the note agreement, Ciro could retire its entire obligation to Swarovski, including principal and interest, by transferring 357,895 shares of Ciro common to Swarovski.

Instead of causing Ciro to retire the Swarovski Note through the transfer of Ciro common, defendants Gold and Levine negotiated a stockholders' agreement with Swarovski on or about March 14, 1991 ("1991 Stockholders Agreement"). In essence, this agreement provided that if Gold and Levine caused Ciro to elect to satisfy the Swarovski Note by paying the $1.5 million in cash, Swarovski would transfer the $1.5 million received from Ciro to Intermediate, which is wholly owned by Gold. In exchange, Intermediate would transfer 357,895 shares of Ciro common stock to Swarovski. *Id.* at 10. Thereafter, defendants Gold and Levine caused Ciro to retire the Swarovski Note by a cash payment of $1.5 million in accordance with the 1991 Stockholders Agreement. Swarovski, then transferred the $1.5 million to Intermediate and in exchange Intermediate transferred 357,895 shares of Ciro common stock. By causing Intermediate to tender its 357,895 shares of Ciro common stock to Swarovski instead of causing Ciro to issue additional common stock or to transfer treasury stock to Swarovski, Gold and Levine allegedly usurped Ciro's corporate opportunity in breach of their fiduciary duties.

On March 14, 1991, the date the 1991 Stockholders Agreement was executed, Ciro's common stock traded at $2½ ask, $1¾ bid and closed at $1¾ per share. Thus, by the terms of the Swarovski Note, Ciro was given the opportunity to sell 357,895 shares of Ciro common stock for $1.5 million, or $4.192 per share, a substantial premium above the market price of $1.75 per share. *Id.* at 9–10. Stated differently, Ciro had the opportunity of retiring a $1.5 million debt to Swarovski by transferring 357,895 shares of Ciro common stock which had a value of only $626,316.25 on the over-the-counter market.

Defendants Gold and Levine allegedly utilized the $1.5 million usurped from Ciro for their own personal benefit. Defendants Gold and Levine allegedly paid the $1.5 million usurped from Ciro to Banque Arabe Internationale D'Investissement ("Banque Arabe") in order to reduce by $1.5 million an $8,250,000 loan from Banque Arabe to Intermediate, which was personally guaranteed in part by Gold and Levine. *Id.* at 14. Thus, by usurping Ciro's corporate opportunity to sell its shares at a premium over the market price to satisfy the Swarovski Note, Gold and Levine personally benefitted by decreasing their potential personal liability to Banque Arabe by $1.5 million. *Id.* at 14–15.

Nowhere in the second amended complaint, however, is there a single allegation that defendants Gold, Levine, and Intermediate made any material misrepresentations or material omissions with respect to the Swarovski Note and the 1991 Stockholders' Agreement. Instead, plaintiffs' theory as stated in the second amended complaint is that Gold and Levine failed to disclose "to the minority shareholders of Ciro that they caused Ciro to satisfy the Swarovski Note in cash in order to, *inter alia,* (i) misappropriate Ciro's corporate opportunity to sell 357,-895 shares of Ciro common stock at a premium of approximately $516,000 to Gold (through Intermediate); and (ii) reduce by $1.5 million a loan made by Banque Arabe to Intermediate which loan was partially guaranteed by Gold and Levine ..." *Id.* at 42. The failure to disclose these facts, according to the second amended complaint, constitutes a violation of §§ 10(b), 14(c), and 20(a) of the Securities Exchange Act and Rules 10b–5 and 14c–6.

### 2. *The Electra Agreement*

The second amended complaint alleges that on or about May 7, 1991, Gold and Levine caused Ciro and Ciro of Bond Street to enter into a securities purchase agreement with Electra Investment Trust PLC ("Electra"), a British public limited company. *Id.* at 8 & 11. Under the terms of the Electra Agreement, Ciro of Bond Street sold senior subordinated notes to Electra for $4.5 million. These senior subordinated notes have a principal amount of $4.5 million with interest rates ranging from 9% to 16% per annum and mature on March 31, 1996. *Id.* at 11. Also pursuant to the Electra Agreement, Ciro sold 550,000 shares of its Series B convertible preferred stock and 450,000 shares of its Series C redeemable preferred stock to Electra for $1,000,000, or $1 per share. *Id.* Both the Series B and Series C preferred stock have the right to receive a dividend of 10% annually. The Series C preferred is redeemable at the option of the Company. *Id.*

This sale of the Ciro Series B and Ciro Series C preferred stock at $1 per share pursuant to the Electra Agreement allegedly constituted a waste of corporate assets because at the time the Electra Agreement was consummated Ciro common stock was trading at $2.75 per share on the over-the-counter market. *Id.* at 16. On or about the date the Electra Agreement was consummated, May 7, 1991, Ciro common stock traded at $3¾ ask, $2¾ bid and closed at $2¾ per share, far in excess of the $1 per share received for the Series B and Series C preferred stock. Moreover, the Series B and Series C preferred stock were superior to the Ciro common because, unlike the Ciro common stock, the Series B and Series C preferred were: (1) entitled to an annual dividend of 10%; (2) entitled to a preference upon liquidation; (3) redeemable at par value in five years at the option of the holder; and (4) convertible into common at the option of the holder. *Id.* Even assuming *arguendo* that the Ciro common and the Ciro Series B and Ciro Series C preferred were equal in value, the Series B and Series C shares should have sold for a minimum of $2.75 million ($2.75 per share X 1 million shares) on the over-the-counter market. Thus, the sale of the Series B and Series C shares constituted a waste of corporate assets totalling at least $1.75 million. *Id.*

The waste of corporate assets visited upon Ciro by the Electra Agreement is allegedly compounded by the extremely low conversion ratios in the Series B and Series C preferred. According to the second amended complaint, Ciro's Form 10–Q filed with the SEC for the period ending June 30, 1991, states that the conversion price of the Series B and Series C preferred varies from $.53 per share to $1.118 per share. *Id.* at 17. At the time of the Electra Agreement, Ciro's projected after tax income for the year ending December 31, 1991 was estimated at $2,435,000. *Id.* at 18. As of June 30, 1991, Ciro had 4,460,399 shares of common stock outstanding. *Id.* The second amended complaint alleges that if none of the Series B and Series C preferred shareholders exercised their conversion rights, Ciro common stock had an estimated earnings of $.54 per share. *Id.* The second amended complaint also alleges that when contrasted with the estimated earnings per share for 1991, the conversion ratios of the Series B and Series C preferred are "ex-

tremely low". *Id.* In support of this conclusion, the second amended complaint avers that the Series D preferred stock issued by Ciro to T. Rowe Price Strategic Fund, L.P ("T. Rowe Price") on August 29, 1991, had a conversion rate of $5.50 per share, far in excess of the conversion ratio for the Series B and Series C preferred. *Id.* at 19. However, the second amended complaint fails to mention any of the rights or characteristics of the Series D preferred stock issued to T. Rowe Price.

Furthermore, the second amended complaint alleges that defendants Gold and Levine misappropriated the proceeds of the Electra Agreement. Although Ciro received $5,500,000 from the Electra Agreement, defendants Gold and Levine allegedly misappropriated $4,887,000 of those funds. Thus, leaving Ciro with only $613,000 of the Electra Agreement proceeds. *Id.* at 15–16.

The second amended complaint avers that the primary motivation underlying the Electra Agreement was the desire of Gold and Levine to obtain desperately needed funds "to meet a loan stock payment commitment to the public holders of H & W stock which was due on or about June 30, 1991, in the amount of approximately £923,000 British Sterling (847,000 pounds plus interest of 76,-000 pounds) or approximately $1.5 million U.S. dollars." *Id.* at 20. Although Ciro had debts of approximately $1.59 million which it owed to H & W, those debt obligations, according to Ciro's Form 10–K for 1990, were not due until August of 1994. However, Ciro retired its debt obligations to H & W sometime in 1991 after the consummation of the Electra Agreement. *Id.* at 20, 24, 28–29, 41. The second amended complaint alleges that this acceleration of Ciro's debt obligations to H & W had the damaging effect of "severely dissipating the value of Ciro's shares of common stock" and "loot[ing] Ciro's coffers." *Id.* at 21 & 23.

In connection with the Electra Agreement, the second amended complaint contains several allegations of material misrepresentations and material omissions. The second amended complaint avers that "these ... material misrepresentations and omissions prevented the minority shareholders of Ciro

from filing a cause of action in state court seeking an injunction preventing Gold and Levine from causing Ciro to enter into the challenged transactions." *Id.* at 42. Notably, all but one of the alleged material misrepresentations and omissions occurred after the date the Electra Agreement was consummated, May 7, 1991. Therefore, the alleged misrepresentations which occurred after May 7, 1991, could not possibly have had the effect of preventing the plaintiffs from seeking injunctive relief in state court because after May 7, 1991, there was no pending transaction to enjoin.

The alleged misrepresentations which occurred after May 7, 1991, are set forth in the second amended complaint as follows: (1) Ciro's Form 10–Q for the period ending June 30, 1991, which was signed by Levine, was materially false in that it represented that Ciro and Ciro of Bond street entered into the Electra Agreement "in order to provide funds for the expansion of its business", when in fact Ciro only actually received $613,000 of $5.5 million of capital generated by the Electra Agreement, *Id.* at 15 & 41; (2) Ciro's Form 10–Q for the period ending June 30, 1991, and Ciro's Form 10–K for the year ending December 31, 1991, contained material omissions which rendered them false and misleading because these forms: (a) failed to disclose the full terms and conditions of the sale of the Series B and Series C preferred stock pursuant to the Electra Agreement; and (b) failed to disclose Ciro's projected earnings for 1991 and failed to disclose that such projections had in fact been made as part of the Electra Agreement, *Id.* at 15 & 41. However, as stated above, these alleged misrepresentations in the June 30, 1991 Form 10–Q and the December 31, 1991 Form 10–K were made after the Electra Agreement was consummated on May 7, 1991. Therefore, these alleged misrepresentations could not possibly have misled the plaintiffs and deterred them from seeking injunctive relief from the Electra Agreement as they allege.

The only alleged material misrepresentation mentioned in the second amended complaint which occurred prior to the consummation of the Electra Agreement and which

might possibly have misled the plaintiffs and deterred them from seeking injunctive relief under state law is contained in Ciro's Form 10–K for the year ending 1990. The second amended complaint alleges that the 1990 Form 10–K was materially false in that it stated that H & W's loans to Ciro of $1.59 million were subordinated long-term debt, when in fact they were payable to H & W on demand. *Id.* at 41.

In addition, the second amended complaint alleges that defendants Gold, Levine, and Intermediate failed to make certain disclosures in connection with the Electra Agreement. The second amended complaint alleges that defendants: (1) failed to disclose that defendants caused Ciro to enter into the Electra Agreement transaction in order to pay a $1.5 million debt that H & W owed to the holders of its public loan stock which was payable on June 1, 1991, *Id.*; (2) failed to disclose "that the paltry sale price [pursuant to the Electra Agreement] of [Ciro's Series B and Series C] convertible preferred and [that] the conversion ratio on the 1,000,000 shares of preferred has resulted and will continue to result in millions of dollars of losses to Ciro," *Id.* at 41–42; and (3) failed to disclose "that Electra, to the extreme detriment of Ciro, was able to extract such favorable terms to itself in connection with Ciro's sale of 1,000,000 shares of convertible preferred and $4.5 million in corporate debt, due to, *inter alia,* Electra's knowledge that the $5.5 million raised in the Electra Transaction would not be staying within Ciro but would be used to pay, directly and/or indirectly, approximately $4 million to Gold and Levine." *Id.* at 42.

### 3. *The Femar Licensing Agreement*

At the outset, it should be noted that with respect to the Femar Licensing Agreement, plaintiffs' second amended complaint only alleges violations of state law and does not state a federal cause of action. According to the second amended complaint, defendants Gold and Levine caused Ciro to enter into an exclusive licensing agreement with Femar Ltd. ("Femar"), a Gibraltar company, on August 19, 1991. *Id.* at 24. Ciro's Form 10–Q for the period ending September 30, 1991, disclosed the terms of the agreement. Femar would receive exclusive use of the "Ciro" trademark in connection with the operation of a catalog business for the sale of costume jewelry in the United States from December 1, 1991 until December 1, 2001. *Id.* at 24–25. The agreement guarantees Femar $100,000 in profits for January 1992 and provides that if Ciro should elect to terminate the licensing agreement, Ciro must pay Femar a termination fee of $2.2 million. *Id.* at 24–25.

The second amended complaint alleges that the Femar licensing agreement constitutes a further act of corporate waste and mismanagement by defendants under state law. To support this conclusion, the second amended complaint alleges that Femar is merely a shell corporation that was formed approximately one week before the licensing agreement was executed. Femar allegedly has no experience in the catalog business and therefore, the agreement which exposes Ciro to $2.2 million in potential liability and guarantees Femar a $100,000 profit in January of 1992, is an act of corporate waste and mismanagement and constitutes a breach of Gold and Levine's fiduciary duty to Ciro under Delaware law. *Id.* at 25 & 44.

### IV. *ANALYSIS*

**A. *Count I: The Claim that Defendants Violated §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5.***

 Although neither § 10(b) nor Rule 10b–5 explicitly provides a private right of action [3], it has been an established rule of law

---

3. Section 10(b) of the Securities Exchange Act of 1934 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange— ...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission [i.e. SEC] may prescribe as necessary or ap-

since the landmark case of *Kardon v. National Gypsum Co.*, 69 F.Supp. 512 (E.D.Pa. 1946), that a private right of action is implied under § 10(b) and Rule 10b–5. *See Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). To state a claim under § 10(b) and Rule 10b–5, a private plaintiff must plead that the defendant "(1) with scienter—an intent to deceive, manipulate, or defraud, (2) made misleading statements or omissions, (3) of material fact, (4) upon which the plaintiff—a purchaser or seller of the security, (5) relied in entering the transaction, and (6) which caused economic loss to the plaintiff." *Scattergood v. Perelman*, 945 F.2d 618, 622 (3d Cir.1991) (citations omitted); *see Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 280 (3d Cir.1992) *cert. denied* — U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992); *see also Lewis v. Chrysler Corp.*, 949 F.2d 644, 649 (3d Cir.1991); *In re Phillips Petroleum Secur. Litigation*, 881 F.2d 1236, 1244 (3d Cir.1989). Thus, a plaintiff who is neither a buyer nor a seller of the securities at issue lacks standing to assert an individual claim for relief under § 10(b) and Rule 10b–5. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–49, 95 S.Ct. 1917, 1923–31, 44 L.Ed.2d 539 (1975) (adopting the rule announced by the Second Circuit in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.1952) *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), that for purposes of a private cause of action for damages under § 10(b) and Rule 10b–5 plain-

tiff must be an actual purchaser or seller of securities). However, a plaintiff who is a shareholder of a corporation may circumvent this rule by bringing a derivative action on behalf of the corporation if the corporation was itself a purchaser or seller of the securities at issue. *Blue Chip Stamps*, 421 U.S. at 738, 95 S.Ct. at 1926; *see also Cramer v. General Tel. & Electronics Corp.*, 582 F.2d 259, 269 (3d Cir.1978) *cert. denied* 439 U.S. 1129, 99 S.Ct. 1048, 59 L.Ed.2d 90 (1979); *Schoenbaum v. Firstbrook*, 405 F.2d 215, 219 (2d Cir.1968); *Phillips v. Tobin*, 403 F.Supp. 89, 94 (S.D.N.Y.1975); *Ruckle v. Roto American Corp.*, 339 F.2d 24, 27–29 (2d Cir.1964).

■ It is also well-established law that a cause of action will not lie under § 10(b) and Rule 10b–5 for mere nondisclosure of corporate mismanagement and breach of fiduciary duty. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 477–80, 97 S.Ct. 1292, 1302–04, 51 L.Ed.2d 480 (1977); *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992) ("[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b–5; nor will an allegation that a defendant failed to disclose the existence of mismanagement."); *Shapiro v. UJB Financial Corp.*, 964 F.2d at 280–81; *Craftmatic Secur. Litigation v. Kraftsow*, 890 F.2d 628, 638–40 (3d Cir.1989); *Biesenbach v. Guenther*, 588 F.2d 400, 402 (3d Cir.1978) ("In effect, appellants are stating that the failure to disclose the breach of fiduciary duty is a misrepresentation sufficient to constitute a

propriate in the public interest or for the protection of investors. 15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC under the authority of § 10(b) states: It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

 (1) To employ any device, scheme, or artifice to defraud,

 (2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

 (3) To engage in any act, practice, or course of business which operates or could operate as a fraud or deceit upon any person in connection with the purchase or sale of a security.

17 C.F.R. § 240.10b–5 (1992). Section 20(a) of the Securities Exchange Act imposes joint and several liability on any person who controls a person liable under any provision of the Securities Exchange Act or any rule thereunder. 15 U.S.C. § 78t(a). In *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), the Third Circuit held that § 20(a) "plainly requires the plaintiff to prove not only that that one person controlled another person, but also that the 'controlled person' is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *Id.* at 279. Accordingly, if all of plaintiffs' predicate § 10(b) and Rule 10b–5 claims are dismissed, there is no basis for imposing § 20(a) liability and the § 20(a) claim must likewise be dismissed.

violation of the Act. We refuse to adopt this approach which would clearly circumvent the Supreme Court's holding in *Santa Fe*."). The fundamental purpose behind the Securities Exchange Act of 1934 is "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor . . .*" *Santa Fe Industries*, 430 U.S. at 477, 97 S.Ct. at 1302 (quoting *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)). To further this end, Congress did not intend to federalize all corporate law touching upon securities transactions. Corporations are creatures of state law and state law governs their internal affairs. In *Santa Fe Industries v. Green*, the Supreme Court per Justice White explained the undesirable consequences that militated against permitting a cause of action under § 10(b) and Rule 10b–5 for the mere breach of corporate fiduciary duty:

> The result would be to bring within the Rule [i.e. Rule 10b–5] a wide variety of corporate conduct traditionally left to state regulation. In addition to posing a "danger of vexatious litigation which would result from a widely expanded class of plaintiffs under Rule 10b–5," *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. at 740 [, 95 S.Ct. at 1927], this extension of the federal securities laws would overlap and quite possibly interfere with state corporate law. Federal courts applying a "federal fiduciary principle" under Rule 10b–5 could be expected to depart from state fiduciary standards at least to the extent necessary to ensure uniformity within the federal system. Absent a clear indication of congressional intent, we are reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities, particularly where established state policies of corporate regulation would be overridden. As the Court stated in *Cort v. Ash*, [422 U.S. 66 [, 95 S.Ct. 2080, 45 L.Ed.2d 26] (1975) ]: "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to stockholders, state law will govern the internal affairs of the corporation." 422 U.S. at 84, 95 S.Ct. at 2090 (emphasis added).

> We thus adhere to the position that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. at 12, 92 S.Ct. at 168.

*Santa Fe Industries*, 430 U.S. at 478–79, 97 S.Ct. at 1303–04.

Although an allegation of failure to disclose mismanagement or breach of fiduciary alone does not state a claim under § 10(b) and Rule 10b–5, such an allegation when coupled with another allegation of a material misrepresentation or omission, that deprives the plaintiff of the opportunity to enjoin the challenged transactions under state law, will state a claim under § 10(b) and Rule 10b–5. *Craftmatic Secur. Litigation*, 890 F.2d at 639; *Healey v. Catalyst Recovery of Pennsylvania, Inc.*, 616 F.2d 641, 646 (3d Cir. 1980).[4] When the plaintiff alleges that the

---

**4.** In *Virginia Bankshares, Inc. v. Sandberg,* ——— U.S. ———, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), the Supreme Court concluded that where the vote of the majority shareholders was legally sufficient to effectuate the challenged transaction, a minority shareholder plaintiff could not prove causation under § 14(a) and Rule 14a–9 as a matter of law. *Id.* at ———, ——— - ———, 2755, 2764–66. In the wake of *Virginia Bankshares,* the Third Circuit has held that the bar on nonvoting causation theories under § 14(a) and Rule 14a–9 announced by the Supreme Court in *Virginia Bankshares* also applies to suits brought by minority shareholders under § 10(b) and Rule 10b–5 because § 14(a) and Rule 14a–9, which govern material misrepresentations and omissions in proxy materials, are "virtual clones" of § 10(b) and Rule 10b–5. *Scattergood v. Perelman,* 945 F.2d at 622 & 625. The defendants argue that *Virginia Bankshares* precludes the plaintiffs' claim in the case at bar. D.I. 50 at 26–27. In *Virginia Bankshares,* the Supreme Court cast some doubt on the continued vitality of lower court decisions which held that allegations by minority shareholders that they were deterred from obtaining injunctive relief under state law from the challenged transactions by the material misrepresentations and omissions of the defendants were sufficient to state a claim under §§ 10(b) and 14(a) of the Securities Exchange Act. *Virginia Bankshares,* ——— U.S. at ———, 111 S.Ct. at 2766. However, despite the aspersions cast by the Supreme Court on this line of lower court decisions, the Supreme Court expressly left

material misrepresentations or omissions caused him to forfeit his right under state law to enjoin the challenged transaction, "the plaintiff must demonstrate that at the time of the alleged misrepresentation or omission, there was a reasonable probability of ultimate success in securing an injunction had there been no misrepresentation or omission . . . [T]he mere existence of an injunctive remedy is not enough; the information must be of a type that if the plaintiff had the information not supplied, he could use it to seek an injunction." *Healey,* 616 F.2d at 647–48. If the plaintiff cannot demonstrate a reasonable probability of obtaining an injunction with the information that was misrepresented or omitted, then the information misrepresented or omitted is immaterial as a matter of law. *Id.* at 648.

With these principles, the Court will consider whether plaintiffs' second amended complaint states a claim under § 10(b) and Rule 10b–5 upon which relief can be granted with respect to the Swarovski Note and Electra Agreement Transactions.

### 1. *The Swarovski Note*

█ Application of these principles to the Swarovski Note transaction, reveals that plaintiffs have failed to state a claim for which relief can be granted under § 10(b) and Rule 10b–5. In essence, the second amended complaint alleges that defendants failed to disclose their breach of fiduciary duty and usurpation of Ciro's corporate opportunity and that such nondisclosure constitutes a violation of § 10(b) and Rule 10b–5. D.I. 46 at 42; *see also* text, *supra,* at pp. 258–59. However, as explained above the Third Circuit has held that the failure to disclose a breach of fiduciary duty is not actionable under § 10(b) and Rule 10b–5. *See Shapiro v. UJB Financial Corp.,* 964 F.2d at 280–81; *Craftmatic Secur. Litiga-*

tion, 890 F.2d at 638–40; *Biesenbach v. Guenther,* 588 F.2d at 402; *see also Santa Fe Industries, Inc. v. Green,* 430 U.S. at 477–80, 97 S.Ct. at 1302–04. Accordingly, plaintiffs' second amended complaint fails to state a claim under § 10(b) and Rule 10b–5 with respect to the Swarovski Note transaction.

### 2. *The Electra Agreement*

█ Analysis of the allegations of the second amended complaint also reveals that the plaintiffs have failed to state a claim upon which relief can be granted under § 10(b) and Rule 10b–5 with respect to the Electra Agreement. As stated above, one of the requisite elements for a claim under § 10(b) and Rule 10b–5 is reliance. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988); *see also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 205–06, 96 S.Ct. 1375, 1386–87, 47 L.Ed.2d 668 (1976) (quoting S.Rep. No. 792, 73d Cong., 2d Sess., 12–13 (1934)); *Affiliated Ute Citizens v. U.S.,* 406 U.S. 128, 153–54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972); *Scattergood v. Perelman,* 945 F.2d at 622; *Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 189 (3d Cir. 1990); *Rochez Bros., Inc. v. Rhoades,* 491 F.2d 402, 410–11 (3d Cir.1974). "Reliance provides the causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic, Inc. v. Levinson,* 485 U.S. at 243, 108 S.Ct. at 989. For the reasons set forth more fully below, the second amended complaint does not sufficiently allege reliance as a matter of law with respect to the Electra Agreement, and thus does not state a claim with respect to the Electra Agreement for which relief can be granted.

Although the second amended complaint alleges that the minority shareholders' reliance on the material misrepresentations and omissions of the defendants prevented them

---

open the question of whether these decisions were still good law. Accordingly, this Court is still bound by the decisions of the Third Circuit such as *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d at 646 and *Craftmatic Secur. Litigation,* 890 F.2d at 639, discussed in the text, which expressly allow a cause of action under § 10(b) and Rule 10b–5 for minority shareholders who allege that the material misrepresentations and omissions of the defendants caused

them to forfeit their right to seek injunctive relief under state law. Absent an express indication from the Third Circuit or the Supreme Court, this Court declines to accept defendants' contention that actions by minority shareholders, who allege that the material misrepresentations and omissions of the defendants caused them to forego seeking injunctive relief under state law, are banned by the Supreme Court's decision *Virginia Bankshares.*

from filing suit and seeking injunctive relief from the Electra Agreement under state law, D.I. 46 at 42; *see also* text, *supra*, at pp. 260–61, all of the alleged material misrepresentations set forth in the second amended complaint concerning the Electra Agreement, save one, occurred after the consummation of the Electra Agreement on May 7, 1991. D.I. 46 at 11. Thus, plaintiffs could not possibly have relied on the alleged misrepresentations contained in Ciro's June 30, 1991 Form 10–Q and Ciro's December 31, 1991 Form 10–K, as they allege in the second amended complaint, in forfeiting their right to seek injunctive relief from the Electra Agreement under state law. *See* D.I. 46 at 15 & 41. At the time those statements were made the Electra Agreement had already been consummated and, therefore, there was no pending transaction to enjoin. Consequently, the plaintiffs could not have relied on these alleged misrepresentations as a matter of law.

The only alleged misrepresentation mentioned in the second amended complaint which occurred prior to the consummation of the Electra Agreement and upon which plaintiffs could possibly have relied, is the alleged misrepresentation in Ciro's Form 10–K for the year ending December 31, 1990. According to the second amended complaint, the 1990 Form 10–K "represents that [H & W's] loan[s] [to Ciro] were long-term subordinated debt payable August 1994", when in fact, H & W's loans to Ciro were payable on demand. D.I. 46 at 28–29, & 41; *see also* text, *supra*, at 260–61. However, in their answering brief in opposition to defendants' motion to dismiss the second amended complaint and at the oral argument held on February 24, 1993, the plaintiffs argued that there exists an additional misrepresentation in a letter to the Ciro stockholders which was signed by both defendants Gold and Levine and dated April 12, 1991. In pertinent part, the letter explains that the Electra Agreement was entered into:

> In order to ensure the financial strength of the company and to provide it with resources to take advantage of new location opportunities which the recessions in the U.K. and the U.S. have produced, we have entered into a letter of intent and are completing agreements for the injection of $1 million of additional equity and $4.5 million of five-year subordinated debt. These funds will be provided by a European public investment institution.

D.I. 51, Exhibit ("Ex.") E at p. 3.

■ Although this alleged misrepresentation in the April 12, 1991 letter is nowhere mentioned in the second amended complaint, the Court will nonetheless consider plaintiffs' contention because the letter is referred to in the second amended complaint in another context. *See* D.I. 46 at 39. Contrary to plaintiffs' contention, there is nothing materially false or misleading concerning the passage from the April 12, 1991 letter quoted above. The letter simply states that Ciro was entering into the Electra Agreement for the purpose of infusing $5.5 million in capital into the corporation. There is no allegation in the second amended complaint that Ciro did not receive $5.5 million from the Electra Agreement. Indeed, the second amended complaint states that "[u]pon information and belief, on or about May 7, 1991, Ciro, in exchange for the aforementioned sale of 1,000,000 shares of preferred and $4.5 million of bonds, received $5.5 million from Electra." D.I. 46 at 12–13. Even if the Electra Agreement was entered into in order to pay off Ciro's obligations to H & W, as the plaintiffs allege in the second amended complaint, the retirement of Ciro's obligations to H & W with the proceeds of the Electra Agreement nonetheless provided financial benefit to Ciro. Plaintiffs' only legally cognizable objection to the Electra Agreement transaction is that Gold and Levine misappropriated the proceeds obtained as a result of the Electra Agreement. However, that objection involves an inquiry into substantive state corporate law and does not implicate the federal securities laws. Accordingly, the Court finds as a matter of law that there was nothing materially false or misleading in the April 12, 1991 letter.

■ The only other alleged misrepresentation remaining upon which the plaintiffs could have possibly relied is the alleged misrepresentation in the 1990 Form 10–K concerning the loans from H & W to Ciro. As

discussed more fully below, the alleged misrepresentation in the 1990 Form 10–K is immaterial as a matter of law.

When a plaintiff alleges that a misrepresentation or omission caused him to forfeit his right to seek injunctive relief under state law, the plaintiff must demonstrate that had the plaintiff been in possession of the correct information, he would have had a reasonable probability of obtaining injunctive relief under state law. If the correct information could not possibly have enabled the plaintiff to obtain injunctive relief under state law, then the alleged misrepresentation or omission is immaterial as a matter of law and the plaintiff has failed to state a claim under § 10(b) and Rule 10b–5. *Healey,* 616 F.2d at 647–48. In order to determine whether the plaintiffs in the case at bar would have had a reasonable probability of obtaining injunctive relief from the Electra Agreement under state law had they known that H & W's loans to Ciro were payable on demand and were not subordinated debt payable in 1994, the Court must look to Delaware law.[5] For the reasons set forth more fully below, the Court concludes that under Delaware law such information would not have supplied the basis for the issuance of an injunction.

Under Delaware law, directors have a fiduciary duty to disclose fully and fairly all material facts within their control when stockholder action is requested, such as when a proxy vote or tender offer is presented. *See Stroud v. Grace,* 606 A.2d 75, 85 (Del. 1992); *Lynch v. Vickers Energy Corp.,* 383 A.2d 278, 281 (Del.1977); *Raskin v. Birmingham Steel Corp.,* No. 11,365, slip op. at 11, 1990 WL 193326 (Del.Ch. December 4, 1990) (per Allen, Chancellor) ("If the board does not seek shareholder action at a meeting, through consent, in a tender or exchange offer, or otherwise, it has, in my opinion, no distinctive state law duty to disclose material developments with respect to the company's

business."). Because the Electra Agreement was effectuated without a stockholder vote, the director defendants Gold and Levine were under no duty to make disclosures to the Ciro shareholders.

However, the inquiry does not end here. It is also well-established Delaware law that once directors voluntarily undertake to make certain disclosures to the stockholders, they are obligated, under the so-called duty of complete candor, to disclose all material facts. This duty arises even when voluntary disclosure is made by the directors and no shareholder action in reliance thereon is requested or contemplated. *Marhart, Inc. v. CalMat Co.,* No. 11,820, slip op. at 5–7, 1992 WL 82365 (Del.Ch. April 22, 1992). In *Lynch v. Vickers Energy Corp.,* 383 A.2d 278, 281 (Del.1977) and in *Rosenblatt v. Getty Oil Co.,* 493 A.2d 929, 944–45 (Del.1985), the Delaware Supreme Court adopted the standard of materiality promulgated by the United States Supreme Court in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Under this standard, materiality requires "[a] showing of a substantial likelihood that, under all of the circumstances, the omitted [or misrepresented] fact would have assumed actual significance in the deliberations of a reasonable shareholder." *Rosenblatt,* 493 A.2d at 944 (quoting *TSC Industries, Inc. v. Northway,* 426 U.S. at 449, 96 S.Ct. at 2132). In *Marhart, Inc. v. CalMat Co.,* Vice Chancellor Berger explained that directors owe a duty of complete candor to the shareholders once they voluntarily undertake to make certain disclosures. *Marhart,* slip op. at 5–7. However, in *Marhart,* Vice Chancellor Berger did not delineate the precise contours of the duty of complete candor. In that case, the plaintiff alleged that the board of directors of CalMat Co. breached their duty of complete candor by making certain misrepresentations in a press release to shareholders

---

**5.** Although federal law governs violations of § 10(b) and Rule 10b–5, the Court must look to substantive state corporate law to determine whether the plaintiffs would have had a reasonable probability of procuring injunctive relief from the challenged transaction. In the case at bar, the Court must look to Delaware law in determining whether the plaintiffs would have

had a reasonable probability of obtaining injunctive relief from the Electra Agreement because Ciro and Ciro of Bond Street are Delaware corporations and the law of the state of incorporation governs the internal affairs of a corporation. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. at 479, 97 S.Ct. at 1304.

which explained the reasons behind the board's decision to reject an offer from Industrial Equity Pacific to purchase all of CalMat's outstanding stock. When the news of the alleged misrepresentation reached the market, the price of CalMat's stock allegedly dropped from $40.00 per share to $30.00 per share. Thus, in *Marhart* the actionable misrepresentations clearly would have been deemed important by a reasonable investor, and thus were material under Delaware law. In the case at bar, however, it is not clear whether a reasonable investor would have deemed it important to know that H & W's loans to Ciro were, in fact, payable on demand and not long term debt payable in August of 1994. Admittedly, whether the alleged misrepresentation was material and therefore actionable as a breach of the duty of complete candor, presents a close question. However, it is a question that the Court need not decide. The inquiry under *Healey v. Catalyst Recovery of Pennsylvania, Inc.* is not whether the defendants' misrepresentation constituted a violation of state law, but rather, the inquiry is whether the plaintiffs would have been able to obtain an injunction under state law from the challenged transaction. 616 F.2d at 646–48. Therefore, in the case at bar, the Court must consider the alleged misrepresentations and determine if the plaintiffs had been aware of the true facts would the plaintiffs have had a reasonable probability of obtaining injunctive relief from the Electra Agreement under Delaware law.

Even assuming that the defendants' statements in the 1990 Form 10–K, concerning the loans from H & W to Ciro constituted a violation of the defendants' duty of complete candor, and assuming *arguendo* that the April 12, 1991 letter was materially false, the imposition of injunctive relief from the Electra Agreement would not have been warranted under Delaware law. To obtain an injunction under Delaware law, the plaintiffs would have had to demonstrate: (1) that they had a reasonable probability of success on the merits; (2) that irreparable harm would have occurred in the absence of an injunction; and (3) that the balance of hardships would have favored the plaintiffs. *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261 (Del.1989).

Since none of the Ciro shareholders nor any third parties suffered any injury in reliance upon the alleged material misrepresentations in the 1990 Form 10–K and the April 12, 1991 letter, the only possible remedy for the alleged material misrepresentations under Delaware law would have been an order requiring additional disclosure. None of the Ciro shareholders, including the plaintiffs, were called upon to make a decision to vote or sell their shares in reliance upon the alleged misrepresentations in Ciro's Form 10–K and the April 12, 1991 letter. Accordingly, none of the Ciro shareholders, including the plaintiffs, suffered any harm as a result of the alleged misrepresentations in Ciro's 1990 Form 10–K and the April 12, 1991 letter, and, *a fortiori,* the plaintiffs could not have demonstrated irreparable harm as required for the issuance of an injunction under Delaware law. *See In re Trans World Airlines, Inc. Shareholders Litigation,* C.A. No. 9844 slip op., 1988 WL 111271 (Del.Ch. October 21, 1988), *reprinted in* 14 Del.J.Corp.L. 870, 886–891 (1989).

The test fashioned by the Third Circuit in *Healey v. Catalyst Recovery of Pennsylvania, Inc.,* 616 F.2d at 646–48, is not whether the plaintiffs would be able to attack the challenged transaction under state law today. Rather, the test is whether at the time of the challenged transaction knowledge of the alleged misrepresentations would have supplied the basis for the plaintiffs to obtain an injunction under state law from the challenged transaction. Therefore, nothing in the Court's opinion should be taken as expressing any view whatsoever as to the merits of any action that the plaintiffs may institute against the defendants in state court.

Two final points are in order with respect to the allegations of the second amended complaint concerning the Electra Agreement. First, the second amended complaint repeats the identical allegations made with respect to the Swarovski Note transaction, namely, that the defendants failed to disclose their breach of fiduciary duty with respect to the Electra Agreement in violation of § 10(b) and Rule 10b–5. As stated above, such an allegation is not actionable under § 10(b) and Rule 10b–5

and does not state a claim for relief thereunder. *See* text, *supra,* pp. 262–63.

Second, the injuries sustained by Ciro and Ciro of Bond Street in the Swarovski Note and the Electra Agreement transactions are the result of the alleged breaches of fiduciary duty by the defendants under Delaware law and are not the result of securities law violations. On this point, the words of Judge Wright in *Warner Communications, Inc. v. Murdoch,* 581 F.Supp. 1482, 1495 (D.Del. 1984), are particularly poignant: "To state a claim under the federal securities laws, there must be a causal link between a party's injuries and the securities law violations ... This Court, and many others, have consistently rejected claims under the securities laws where a party's injuries have resulted not from alleged misrepresentations relating to acts of misconduct, but rather, from the alleged misconduct itself." *Id.*

In summary, the Court finds that the plaintiffs' second amended complaint fails to state a claim upon which relief can be granted under § 10(b) and Rule 10b–5 with respect to the allegations concerning the Swarovski Note and Electra Agreement transactions. Because there is no claim stated under § 10(b) and Rule 10b–5, plaintiffs' second amended complaint also fails to state a claim upon which relief can be granted under § 20(a). *See* text, *supra,* at pp. 261–62, footnote 3.

### B. Count III: The Claim that Defendants Violated § 14(c) of the Securities Exchange Act and Rule 14c–6.

Count III of the second amended complaint alleges that the defendants violated § 14(c) of the Securities Exchange Act and Rule 14c–6 promulgated thereunder. However, neither § 14(c) nor Rule 14c–6 expressly provides for a private right of action. Therefore, the Court must determine as a threshold matter whether under § 14(c) and Rule 14c–6 there exists an implied private right of action for minority shareholders of a corporation. *See generally Diceon Electronics, Inc. v. Calvary Partners, L.P.,* 772 F.Supp. at 862–65.

In *Diceon,* this Court canvassed the relevant law on the issue of implied private rights of action under the Securities Exchange Act. The Court explained that under the decision of the United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), there are four factors which must be considered in determining whether a private right of action is implied: (1) Is the plaintiff one of the class for whose *especial* benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?; (2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?; (3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?; and (4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?. *Id.* (quoting *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2087). In *Diceon* this Court explained that "[t]he four factors, however, should not be applied with equal weight. The most important consideration is legislative intent." *Diceon Electronics,* 772 F.Supp. at 863. Finally, this Court remarked that "an accurate determination of legislative intent must take into consideration the 'contemporary legal context' in which Congress acted." *Id.*

Section 14(c) provides, in pertinent part, that:

Unless proxies ... in respect of a security registered pursuant to section 78l of this title ... are solicited by or on behalf of the management of the issuer from the holders of record of such security in accordance with the rules and regulations prescribed under subsection (a) of this section [i.e. § 14(a)], prior to any annual or other meeting of the holders of such security, such issuer shall, in accordance with rules and regulations prescribed by the Commission [i.e. SEC], file with the Commission and transmit to all holders of record of such security information substantially equivalent to the information which would be required to be transmitted if a solicitation were made....

15 U.S.C. § 78n(c). In short, § 14(c) requires management, when no proxy vote is undertaken, to nonetheless disseminate information statements to shareholders that contain substantially the same information required to be provided in a proxy solicitation.[6]

■ The Court finds, however, that any inquiry into the legislative history of § 14(c) is unnecessary because the Supreme Court's decision in *Virginia Bankshares, Inc. v. Sandberg*, —— U.S. ——, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991), precludes any creation of an implied cause of action under § 14(c) in cases, such as the case at bar, where minority shareholders are seeking relief from a transaction that they could not have prevented. In *Virginia Bankshares*, the United States Supreme Court held that Section 14(a) of the Securities Exchange Act did not imply a private right of action for minority shareholders seeking to challenge a transaction when those minority shareholders did not have the power to prevent the challenged transaction by voting their shares differently. *Id.* at ——–——, 111 S.Ct. at 2761–65. As explained by Justice Souter, the rationale for the *Virginia Bankshares* holding is that any injury to the minority shareholders is not caused by the misrepresentation in the proxy materials, but rather, is caused by the mere fact that the minority shareholders were powerless to stop the proposed transaction. Moreover, the Court noted that to permit such private causes of action by minority shareholders under § 14(a) would foster vexatious litigation and place an extraordinary burden on the district courts:

> [T]hreats of speculative claims and procedural intractability are inherent in respondents' theory of causation linked through the directors' desire for a cosmetic vote. Causation would turn on inferences about what the corporate directors would have thought and done without the minority shareholder approval unneeded to authorize action. A subsequently dissatisfied minority shareholder would have virtual license to allege that managerial timidity would have doomed corporate action but

for the ostensible approval induced by a misleading statement, and opposing claims of hypothetical diffidence and hypothetical boldness on the part of directors would probably provide enough depositions in the usual case to preclude any judicial resolution short of the credibility judgments that can only come after trial. Reliable evidence would seldom exist. Directors would understand the prudence of making a few statements about plans to proceed even without minority endorsement, and discovery would be a quest for recollections of oral conversations at odds with the official pronouncements, in hopes of finding support for *ex post facto* guesses about how much heat the directors would have stood in the absence of minority approval. The issues would be hazy, their litigation protracted, and their resolution unreliable. Given a choice we would reject any theory of causation that raised such prospects, and we reject this one.

*Id.* at ——, 111 S.Ct. at 2765. The Supreme Court's rationale in *Virginia Bankshares* is equally applicable to the claims of minority shareholders under § 14(c). Claims by minority shareholders under § 14(c) suffer from the same defect of lack of causation. Moreover, the claims of minority shareholders seeking relief under § 14(c) are more attenuated than the claims of minority shareholders under § 14(a). At least minority shareholders seeking relief under § 14(a) have been asked by the directors of the corporation to vote their shares. Minority shareholders seeking relief under § 14(c) have not been called upon by the directors of the corporation to take any action whatsoever. Whether relief is sought under § 14(a) or § 14(c), the fact remains that the minority shareholders were not damaged by any misrepresentation, but rather, they were damaged by virtue of their inability to stop the challenged transaction due to their status as minority shareholders. Accordingly, the Court holds that no implied private right of

---

**6.** Rule 14c–6 provides, *inter alia*, that "[n]o information statement shall contain any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact or which omits to state any material fact. . . ." 17 C.F.R. 240.14c–6 (1992).

action under § 14(c) exists for minority shareholders.

■ This conclusion denying an implied private right of action for minority shareholders under § 14(c) and Rule 14c–6 applies with equal force to derivative actions brought by minority shareholders on behalf of the corporation, such as that in the case at bar. "Although technically brought as a suit by the corporation, the shareholder derivative suit is, in substance, not a corporate suit against a third party but a shareholder suit against those in control of the corporation." *Diceon,* 772 F.Supp. at 868 (quoting *Polaroid Corp. v. Disney,* 862 F.2d 987, 1001 n. 10 (3d Cir.1988)). Accordingly, this Court finds no reason for distinguishing between actions brought by minority shareholders in their individual capacity from actions brought by minority shareholders on behalf of the corporation.

However, even if an implied private right of action were found to exist under § 14(c) and Rule 14c–6, plaintiffs would nonetheless have no cause of action thereunder because they cannot establish causation. Plaintiffs' theory of recovery, as explained above, is that but for the material misrepresentations and omissions of the defendants, the plaintiffs would have obtained injunctive relief from the challenged transactions. As explained above, the failure of the defendants to disclose their putative breach of fiduciary duty in connection with the Swarovski Note transaction is not an actionable misrepresentation or omission under § 10(b) and Rule 10b–5 and therefore would not constitute an actionable misrepresentation under § 14(c) and Rule 14c–6. Furthermore, as also explained above, the alleged misrepresentations and omissions concerning the Electra Agreement would not have supplied the basis for obtaining an injunction from the Electra Agreement transaction under Delaware law. Accordingly, the plaintiffs cannot demonstrate causation.

## C. *The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.*

The defendants contend that the dismissal of plaintiffs' federal securities law claims in Counts I and III of the second amended complaint warrants the dismissal of the remaining state law claim in Count II for breach of fiduciary duties. In support of this contention, the defendants argue that there is no independent basis for jurisdiction over the state law claim for breach of fiduciary duties in Count II because the presence of aliens as party plaintiffs and party defendants in this litigation precludes this Court's exercise of diversity jurisdiction.[7] *See Field v. Volkswagenwerk AG,* 626 F.2d 293, 296 (3d Cir.1980); *see also Jet Traders Invest. Corp. v. Tekair, Ltd.,* 89 F.R.D. 560 (D.Del.1981) (both cases stand for the proposition that the presence of aliens as both plaintiffs and defendants destroys diversity under 28 U.S.C. § 1332).

In *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1280–81 (3d Cir.1993), the Third Circuit held that a dismissal of a federal claim for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6) alone does not mandate the dismissal of all remaining supplemental state law claims which do not have an independent basis of jurisdiction. In *Growth Horizons,* Judge Stapleton, writing for the Court, explained that "[t]he rule that legal insufficiency of a federal claim generally does not eliminate the subject matter jurisdiction of a federal court has been reaffirmed and clarified by both the Supreme Court and this Court on several occasions: '[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is "so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not

---

**7.** The second amended complaint alleges that two of the plaintiffs, John Burrows and Eunice Caplan are citizens of the United Kingdom and, thus, are considered aliens for the purposes of determining diversity under 28 U.S.C. § 1332. Defendants Gold and Levine are Canadian citizens and defendant Intermediate is a Cayman Islands corporation with its principal place of business in Freeport, Bahamas. Accordingly, all three defendants, Gold, Levine, and Intermediate are also aliens. Thus aligned, there are aliens on both sides of the litigation as plaintiffs and defendants.

to involve a federal controversy." ' " *Id.* at 1280–81 (quoting *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 899 (3d Cir. 1987)). This Court need not decide the thorny question of whether the federal securities law claims in Counts I and III of the second amended complaint are so insubstantial and implausible such that they do not create a federal controversy. For the reasons set forth more fully below, the Court in the exercise of its sound discretion under 28 U.S.C. § 1367(c)(3) declines to exercise supplemental jurisdiction with respect to the state law claims in Count II of the second amended complaint.

■■■ Section 1367(c)(3) provides that the district court may decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). In *Growth Horizons, Inc. v. Delaware County,* 983 F.2d at 1284, Judge Stapleton explained that in determining whether or not to exercise supplemental jurisdiction once all of the federal claims are dismissed, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.' " *Id.* (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)). Consideration of these factors convinces this Court that supplemental jurisdiction should not be exercised over plaintiffs' state law claims.

The first factor, judicial economy, is decidedly in favor of declining supplemental jurisdiction. The gravamen of plaintiffs' second amended complaint concerns breaches of fiduciary duty and substantive violations of Delaware corporate law. The United States District Court for the District of Delaware does not purport to possess any special expertise in issues of Delaware corporate law. Resolution of these complex issues in the first instance is the province of the Delaware Chancery Court. Therefore, the most expedient resolution of this case would be the dismissal of this action in federal court and the commencement of a new action in the Delaware Court of Chancery by the plaintiffs.

The second and third factors, convenience and fairness to the litigants, are also decidedly in favor of declining supplemental jurisdiction. The Delaware Court of Chancery is located in Wilmington as is this Court. Thus, the parties would not be inconvenienced by having to litigate in the Delaware Court of Chancery. Moreover, since no answer has been filed in this action in federal court and since discovery has not yet begun, there has been no appreciable investment of time and energy in preparing for trial. Thus, there would be no unfairness and no inconvenience to the parties by virtue of this Court's determination not to exercise supplemental jurisdiction.

In connection with these findings, the Court notes that plaintiffs' original complaint alleged violations of Delaware law and sought to invoke this Court's jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332. When it became apparent to the plaintiffs that there was not complete diversity, the plaintiffs amended their complaint to add federal statutory claims in an attempt to remain in federal court pursuant to federal question jurisdiction. No matter how the plaintiffs attempt to style the allegations in the present case, they concern only issues of Delaware corporate law and do not implicate the federal securities laws. Thus, the forum for proper resolution of this entire dispute is the Delaware Court of Chancery.

To summarize, the Court holds that Count I of the second amended complaint fails to state a claim under §§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b–5. Count III of the second amended complaint fails to state a claim under § 14(c) of the Securities Exchange Act and Rule 14c–6 because the Court holds that there is no implied private right of action for minority shareholders to sue either in their individual capacity or derivatively under § 14(c) and Rule 14c–6. Lastly, the Court declines to exercise supplemental jurisdiction over plaintiffs' state law claim in Count II of the second amended complaint. Accordingly,

plaintiffs' second amended complaint will be dismissed.[8]

---

8. Because the Court has determined to dismiss the entire second amended complaint for the reasons set forth above, the Court finds it unnec-essary to consider defendant Intermediate's motion to dismiss for lack of personal jurisdiction.